**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

ALYSSA CARTON,

   Plaintiff,

v.             CIV 17-0037 KG/SCY

CARROLL VENTURES, INC.,

    Defendant.

## NOTICE AND ORDER

 **THIS MATTER** comes before the Court on the correspondence received from attorney Sharon Pomeranz.

 During the May 11, 2017, hearing, Plaintiff Alyssa Carton and her counsel, Sharon Pomeranz, indicated that they had entered into agreements with a firm named Litigation Management [and Financial] Services.  The Court ordered Ms. Carton and Ms. Pomeranz to provide the Court copies of those agreements and stated that the Court would determine whether those agreements should be made available to Defendants.  Ms. Pomeranz submitted the agreements, along with a cover letter dated May 12, 2017, to the Court via email.  Having reviewed the agreements, the Court finds that they should be made available to Defendants and that a protective order is not necessary.  The agreements are attached to this Notice and Order as Exhibits 1 and 2.

 In addition to transmitting the agreements, Ms. Pomeranz' May 12, 2017, cover letter addresses "the court's consideration of sanctions."  On May 16, 2017, Ms. Pomeranz sent the Court an email stating:

Honorable Judge Molzen,

Please find attached an email I received from Craig Broadbent, of Litigation Management Company, addressing the AID lawsuits in Arizona.  I thought this would be helpful to your consideration.

Respectfully,

Sharon Pomeranz.

Ms. Pomeranz' May 12, 2017, cover letter and her May 16, 2017, email to the Court are *ex parte* communications.  "A lawyer shall not . . . communicate ex parte with [a judge] during the proceeding unless authorized to do so by law or court order."  N.M. Rule Professional Conduct 16-305(B); D.N.M.LR-83.9 ("The Rules of Professional Conduct adopted by the Supreme Court of the State of New Mexico apply" in the United States Court for the District of New Mexico).  The Court notifies Ms. Pomeranz that future *ex parte* communications from her may result in sanctions.

The Court also has obligations regarding *ex parte* communications:

Except as set out below, a judge should not initiate, permit, or consider ex parte communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers.  If a judge receives an unauthorized ex parte communication bearing on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested.  A judge may:

(a)  initiate, permit, or consider ex parte communications as authorized by law;

(b)  when circumstances require it, permit ex parte communication for scheduling, administrative, or emergency purposes, but only if the ex parte communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication;

(c)  obtain the written advice of a disinterested expert on the law, but only after giving advance notice to the parties of the person to be consulted and the subject matter of the advice and affording the parties reasonable opportunity to object and respond to the notice and to the advice received; or

(d)  with the consent of the parties, confer separately with the parties and their counsel in an effort to mediate or settle pending matters.

Guide to Judiciary Policy, Chapter 2: Code of Conduct for United States Judges, Canon 3(A)(4). The Court notifies Defendants of the subject matter of Ms. Carton's *ex parte* communications with the Court by attaching her May 12, 2017, cover letter and the attachment to her May 16, 2017, email to this Notice and Order as Exhibits 3 and 4.

Ms. Pomeranz also indicated at the May 11, 2017, hearing that she and Ms. Carton entered into an agreement regarding Ms. Pomeranz' representation of Ms. Carton in this matter. Ms. Pomeranz shall file a copy of that agreement in Ms. Carton's pending cases listed below within two days of entry of this Notice and Order.

**IT IS ORDERED** that Ms. Pomeranz shall, within two days of entry of this Notice and Order, file a copy of the agreement between Ms. Pomeranz and Ms. Carton in the cases listed below.

**IT IS ALSO ORDERED** that the Clerk of the Court file this Notice and Order in each of the following cases:

| | |
|---|---|
| 1:17-cv-00037-KG-SCY | Carton v. Carroll Ventures Inc. |
| 1:17-cv-00038-KBM-WPL | Carton v. Cole MT Albuquerque (San Mateo) NM LLC |
| 1:17-cv-00039-SCY-LF | Carton v. Courtyard NM LLC |
| 1:17-cv-00040-KK-SCY | Carton v. HDY LLC |
| 1:17-cv-00041-SCY-WPL | Carton v. Roshni |
| 1:17-cv-00043-SCY-KBM | Carton v. Laxmi Management LLC |
| 1:17-cv-00044-LF-KK | Carton v. LBC Company, LLC |
| 1:17-cv-00046-SCY-KBM | Carton v. San Mateo/Indian School, Inc. |
| 1:17-cv-00047-KK-WPL | Carton v. Spilca Nicolae & Mariana |
| 1:17-cv-00048-WPL-SCY | Carton v. Spirit Master Funding, LLC |
| 1:17-cv-00058-SCY-KK | Carton v. Autozone Stores LLC |
| 1:17-cv-00060-KK-WPL | Carton v. Blakes Lotaburger, LLC |
| 1:17-cv-00063-WPL-SCY | Carton v. Cole AB Albuquerque NM, LLC |

3

| | |
|---|---|
| 1:17-cv-00065-GBW-KK | Carton v. Diamond Shamrock Stations, Inc. |
| 1:17-cv-00066-KK-KBM | Carton v. East Lomas, Partnership |
| 1:17-cv-00069-LF-KK | Carton v. Goatcher Family, LTD |
| 1:17-cv-00073-WPL-SCY | Carton v. Market Center East Retail Property, Inc. |
| 1:17-cv-00075-WPL-CG | Carton v. Miller Family Real Estate, LLC |
| 1:17-cv-00077-KK-WPL | Carton v. Pacific Realty, CO |
| 1:17-cv-00078-WPL-LF | Carton v. Q Market Center, LLC |
| 1:17-cv-00080-LF-KK | Carton v. Realty Income, Corporation |
| 1:17-cv-00082-KK-KBM | Carton v. Brunetto et al |
| 1:17-cv-00083-LF-WPL | Carton v. Southwest Capital Projects, LLC |
| 1:17-cv-00084-SCY-KBM | Carton v. Westland Properties, LLC |
| 1:17-cv-00085-GJF-KBM | Carton v. Zia Trust, Inc. |
| 1:17-cv-00153-WPL-KK | Carton v. B+H Investments, LLC |
| 1:17-cv-00154-GBW-KK | Carton v. Fair Plaza, Inc |
| 1:17-cv-00156-SCY-LF | Carton v. Hayman Nurseries, LLC |
| 1:17-cv-00159-SMV-LF | Carton v. Kawips New Mexico, LLC |
| 1:17-cv-00160-GJF-LF | Carton v. LNU, et al |
| 1:17-cv-00161-LF-KBM | Carton v. M & E New Mexico Property, LLC |
| 1:17-cv-00162-WPL-LF | Carton v. Monarch Land, LLC |
| 1:17-cv-00163-KK-WPL | Carton v. Montgomery-Juan Tabo Properties, LLC |
| 1:17-cv-00164-SCY-WPL | Carton v. New Mexico Bank & Trust |
| 1:17-cv-00165-WPL-LF | Carton v. Pacific Bistro Partnership |
| 1:17-cv-00166-KBM-KK | Carton v. Pizza Hut of America LLC |
| 1:17-cv-00167-SCY-LF | Carton v. Jaramillo, et al |
| 1:17-cv-00170-KBM-KK | Carton v. Starlight Investments, LLC |
| 1:17-cv-00173-RB-SCY | Carton v. Three J's, Limited Partnership |
| 1:17-cv-00174-KK-KBM | Carton v. Tulsi Group, LLC |
| 1:17-cv-00211-WPL-GJF | Carton v. Autozone Stores, LLC |
| 1:17-cv-00213-KBM-KK | Carton v. Blakes Lotaburger, LLC |
| 1:17-cv-00215-KK-KBM | Carton v. Circle K Stores, Inc. |
| 1:17-cv-00218-KBM-LF | Carton v. Circle K Stores, Inc. |
| 1:17-cv-00220-SCY-KBM | Carton v. Goatcher Family, LTD |
| 1:17-cv-00223-SCY-KK | Carton v. M & S Properties, LLC |
| 1:17-cv-00224-KK-LF | Carton v. Medlock-New Mexico Properties, LLC |

| | |
|---|---|
| 1:17-cv-00225-KBM-KK | Carton v. Ling, et al. |
| 1:17-cv-00227-KBM-WPL | Carton v. Tachung Investment Company |
| 1:17-cv-00228-LF-KK | Carton v. Up Your Alley, LLC |
| 1:17-cv-00229-KK-KBM | Carton v. Wells Fargo Bank New Mexico N A |
| 1:17-cv-00293-SCY-WPL | Carton v. 9613, LLC |
| 1:17-cv-00294-SCY-LF | Carton v. Albertson's LLC |
| 1:17-cv-00295-LF-KBM | Carton v. Amerco Real Estate Company |
| 1:17-cv-00296-LF-CG | Carton v. Blake's Lotaburger, LLC |
| 1:17-cv-00297-SCY-KK | Carton v. Conquistadores, Inc. |
| 1:17-cv-00298-SCY-KK | Carton v. D.W. Investments, Inc. |
| 1:17-cv-00299-LF-SCY | Carton v. LNU et al |
| 1:17-cv-00300-KK-WPL | Carton v. Zhao et al |
| 1:17-cv-00301-KK-WPL | Carton v. Eubank 3801, LLC |
| 1:17-cv-00302-KBM-KK | Carton v. Family Medicine, P.C. |
| 1:17-cv-00303-LF-KBM | Carton v. Fu Yuang, LLC |
| 1:17-cv-00304-LF-CG | Carton v. LNU, et al. |
| 1:17-cv-00305-KK-SCY | Carton v. LNU |
| 1:17-cv-00306-KK-KBM | Carton v. LNU |
| 1:17-cv-00308-KK-KBM | Carton v. Masada Limited Company |
| 1:17-cv-00309-GJF-LF | Carton v. Palo Alto, Inc. |
| 1:17-cv-00310-LF-KBM | Carton v. Quality Jeep Limited Partnership |
| 1:17-cv-00311-SMV-KK | Carton v. Scottsdale Village, LLC |
| 1:17-cv-00313-LF-WPL | Carton v. Starbucks Coffee Company |
| 1:17-cv-00314-CG-SCY | Carton v. Trimari Holdings, LLC |
| 1:17-cv-00315-KK-KBM | Carton v. U.S. Bank National Association |

_Karen B Molzen_

**UNITED STATES CHIEF MAGISTRATE JUDGE**

Litigation Funding Agreement

## LITIGATION FUNDING AGREEMENT

This Litigation Funding Agreement ("Agreement") is entered into this ⌊ day of ⌊ ⌊ , 2016, by and between Alyssa Carton ("Claimant") and Litigation Management and Financial Services, LLC ("Company") (collectively referred to herein as "Parties") as follows:

## RECITALS

1. On July 26, 1990, the Americans with Disabilities Act ("ADA") was signed into law. The ADA is a comprehensive civil rights law prohibiting discrimination on the basis of disability.

   a. The ADA contains four sub-parts. The first three sections of the statute, Titles I, II, and III, bar discrimination on the basis of disability in different areas of public life. ADA Title III addresses disability discrimination in public accommodations, defined to include places of education including post-graduate private schools, and bars disability discrimination by "any person who owns, leases (or leases to), or operates a place of public accommodation." §§ 12181(7)(J), 12182. The enforcement provision of Title III, § 12188, incorporates the remedies of Title II of the Civil Rights Act, 42 U.S.C. § 2000a-3.

2. Title III of the ADA contains a list of general activities that it defines as discrimination: the denial of an opportunity to participate, 42 U.S.C. §§ 12182(b)(1)(A)(i), 12182(b)(1)(C); the provision of an unequal benefit, *id.* § 12182(b)(1)(A)(ii); and the provision of a separate benefit, unless doing so is necessary to provide a benefit that is as effective as that provided to others. *Id.* § 12182(b)(1)(A)(iii).[12]Furthermore, the statute requires benefits provided to people with disabilities to be afforded in the most integrated setting appropriate to the needs of the individual. *Id.* § 12182(b)(1)(B).

3. Title III of the ADA prohibits discrimination on the basis of disability by those who own or operate places of public accommodation. 42 U.S.C. § 12182(a). In enacting the ADA, Congress found that "historically, society has tended to isolate and segregate individuals with disabilities." 42 U.S.C. § 12101(a)(2). The ADA's legislative history states that "[i]ntegration is fundamental to the purposes of the ADA. Provision of segregated accommodations and services relegate persons with disabilities to second-class citizen status." H. Rep. 101–485(III), 101st Cong., 2d Sess., at 56, *reprinted in* 1990 U.S.C.C.A.N. 445, 479. " '[T]he goal [is to] eradicat[e] the "invisibility of the handicapped." ' Separate-but-equal services do not accomplish this central goal and should be rejected." *Id.* at 50, 1990 U.S.C.C.A.N. at 473. The ADA provides a "broad mandate" to "eliminate discrimination against disabled individuals, and to integrate them 'into the economic and social mainstream of American life.' " *PGA Tour, Inc. v. Martin,* 532 U.S. 661, 675, 121 S.Ct. 1879,149 L.Ed.2d 904 (2001) (quoting H.R.Rep. No. 101–485, pt. 2, p. 50 (1990),*reprinted in* 1990 U.S.C.C.A.N. 303, 332).

4. This integration mandate is found in two sections of the statute. Title III makes it discriminatory to provide individuals with disabilities "with a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other

**Exhibit 1**

individuals, unless such action is necessary" to provide facilities, accommodations and the like that are as effective as those provided others. 42 U.S.C. § 12182(b)(1)(A)(iii). It also requires that "[g]oods, services, facilities, privileges, advantages, and accommodations shall be afforded to an individual with a disability in the most integrated setting appropriate to the needs of the individual." *Id.,* § 12182(b)(1)(B).

5.  Section 303 of the ADA required that all facilities designed and constructed after January 26, 1993 must be "readily accessible to and useable by" individuals with disabilities. 42 U.S.C. § 12183(a)(1). The statute further instructed the DOJ to adopt implementing standards and regulations. 42 U.S.C. § 12186(b). On July 26, 1991, the DOJ adopted the Americans with Disabilities Act Accessibility Guidelines as the 1991 Standards. 28 C.F.R. § 36.406(a) (1991). The 1991 Standards are now published as Appendix D to title 28, part 36 of the Code of Federal Regulations. On September 15, 2010, the DOJ amended its regulations and adopted the 2010 Standards.

6.  The ADA also provides a private right of action for preventative relief, including an application for a permanent or temporary injunction or restraining order for 'any person who is being subjected to discrimination on the basis of disability in violation of' Title III." 42 USC §§ 12182(a)(1), 2000a-3(a)).

7.  Virtually all individual States have passed legislation similar in intent and scope to the ADA.

8.  Private enforcement suits are the primary method of obtaining relief under the ADA.

9.  The Claimant wishes to pursue Claims including private rights of action against places of public accommodation with barriers to people with disabilities.

10. Claimant wishes to pursue Claims on their own behalf, but with the understanding that enforcement of Claims may cause compliance by places of public accommodation which may lead to the removal of barriers to other persons with disabilities who have not yet, or could not bring their own claims.

11. Claimant wishes to pursue the Claims. However, Claimant does not wish to carry the financial burden of the litigation, nor the risk associated with legal costs.

12. Company is not entitled to or obliged to provide legal advice to Claimant. The preparation and conduct of litigation which is funded by Company is the responsibility of the Claimant and the Claimant's lawyer.

**NOW, THEREFORE,** the Parties enter the following

## AGREEMENT

1.  **Object and Limitations of Engagement:** This Agreement is limited to providing funding to Claimant and to Claimant's attorney for legal services. The Claimant does not wish to bear the litigation risk in pursing the Claims. For this reason, the Parties have agreed that

Litigation Funding Agreement

Company shall bear the costs so that Claimant may pursue the Claims. This cooperation commences on the date indicated above in this Agreement and ends once the Claims have been determined and the Proceeds have been distributed or this agreement is terminated by Company. If the Claims are successful, the Proceeds will be distributed in accordance with this Agreement.

## 2. Duties and Representations

a. The Claimant represents:

    i. that it has the full right, power and authority to pursue the Claims and that it has not sold, transferred, assigned, or otherwise disposed of its interest in the Claims;

    ii. there is no agreement with a third party preventing the Claimant from assigning the Claims or its financial interest in the Claims and the Claimant is free to assign Claims or financial interests without obtaining the consent of a third party;

    iii. the Claimant is not aware of any circumstances other than those listed in the recital above, which could affect the validity or enforceability of the Claims.

    iv. The documents which the Claimant has supplied, or will supply, provide a true, accurate and complete representation of the circumstances giving rise to the Claims;

    v. There is no other dispute between the Claimant and the Opponent, whether past, current, or future, which could have an impact on the Claims;

    vi. There are no enforceable judgment against the Claimant which may result in insolvency proceedings being commenced against the Claimant.

b. Claimant Duties

    i. Claimant shall carry out all appropriate and necessary acts which support the favorable determination of the Claims with reasonable care and will fully support the proceedings

    ii. Claimant shall obtain Company's consent in advance of incurring costs. The Claimant shall pass this obligation on to its lawyer.

    iii. Claimant shall obtain Company's consent before disposing of the Claims.

    iv. Claimant may only discontinue the Claims with the prior consent of Company.

    v. Claimant is obliged at the request of Company to pursue enforcement of any judgments obtained.

    vi. Claimant hereby releases its lawyer from any duties of confidentiality as concerns communication and disclosure between the lawyer and Company of information relating to the Claims.

    vii. Claimant shall inform Company promptly and on an ongoing basis via its lawyer on the status of proceedings and shall send to Company, promptly and without need for Company request, of new circumstances which have come to light and which have an impact on the assessment of the merits or the validity of the Claims or the legal risk. The Claimant shall pass on these obligations to its lawyer. The Claimant agrees to execute a separate power

of attorney which shall entitle Company to request and view official and/or court documents.

c. Company Duties
  i. Company shall carry out a review free of charge to assess whether the Claims are capable of funding. Company shall not provide legal advice to Claimant. Company's review is purely for its own benefit and for the purposes of assessing the prospects of success of the Claims. Company is not obliged to justify its acceptance or rejection of any case.
  ii. Funding: Subject to the terms set out in this agreement, Company shall pay the costs of pursuing the Claims including costs of legal advice and representation, court fees, costs arising from a court order in relation to evidence and costs payable to the Opponent, providing the costs arise after this agreement comes into force. Costs of legal advice and representation must be pre-approved by Company including a review of Claimant's attorney-client agreement. Company shall make such payments for costs directly to Claimant's lawyer. The Claimant hereby authorizes its lawyer to accept receipt of the payments.
  iii. Subject to the terms set out in this agreement, Company shall pay to Claimant $50.00 for each of Claimant's claims that result in a filed complaint initiating a civil action. This advance of costs is not required to be repaid to Company and is to be kept by Claimant regardless of the outcome of the action
    1. Pay Schedule: Company shall pay to Claimant $50.00 for each of Claimant's claims that result in a filed complaint within twenty-one (21) calendar days of filing a complaint.
  iv. Company shall not be obligated to pay Claimant's travel costs, transfer fees or other bank charges, costs arising from a set-off, or any other costs or fees not specifically outlined in this agreement.
  v. Company shall pay the prescribed costs of enforcing a judgment where Company deems enforcement to be necessary and to have sufficient prospects of success.

3. Distribution of Proceeds
  a. From the Proceeds of any successful Claims, Company shall first be entitled to deduct all costs which Company has already incurred and any costs which it has yet to pay in accordance with this Agreement.
  b. Claimant shall be entitled to all remaining Proceeds.
  c. Claimant hereunder acknowledges the existence of an attorney-client agreement. This Agreement, including this section discussing the distribution of Proceeds, shall not supersede any promise of payment made between Claimant and his/her attorney.
  d. Claimant hereunder fully consents and agrees for Company to pay to Claimant's attorney all or any portion of Claimant's promised fee to Claimant's attorney as agreed in Claimant's attorney-client agreement.
  e. The term Proceeds shall include financial gains (including interest) which the Claimant's attorney is able to recover as a result of the court's or any other official judgment, a court approved or out-of-court settlement, or an admission by the

Opponent. Proceeds, as described in this Agreement, shall only refer to monetary funds and shall not include causes of action for the Claimant's benefit, financial gain which is the result of being released from a claim, or the expiration of a claim against Claimant.

f. Each party shall be responsible for the taxation of its share of the Proceeds.

g. Company, in its judgment, is entitled to determine the date on which Proceeds are to be paid, but shall be paid no later than 60 days after Proceeds are in the control of Claimant, Claimant's agent, or Claimant's attorney.

h. The Claimant is obliged to provide information to Company, whether requested by Company or not, confirming the receipt, the nature and the value of any Proceeds, including any pecuniary advantage obtained as a result of the successful Claims funded by Company.

i. Payment of the Proceeds shall be made into the Claimant's lawyer's client account and shall remain held until the distribution of the Proceeds has been calculated and approved by Company. The Claimant shall require all Proceeds to be paid directly to its lawyer.

4. Assignment of Claims to Company as Security

a. The Claimant shall assign all Claims, rights to claim costs and all subsidiary rights to Company by way of security if at any point an assignment agreement is requested by Company

b. The Claimant shall, if so required by Company, execute a deed or other notarized document which gives effect to such assignment.

c. The Claimant shall, if so required by Company, execute and convey power of attorney to Company.

5. Confidentiality

a. All discussions between Company with Claimant, Company with Claimant's attorney, and any of Company's representative with any of Claimant's representatives, including this agreement are confidential and intended to remain confidential. Except as expressly permitted herein, The Parties agrees not to disclose the existence of this Agreement, any of its terms, or any other details learned while engaged with one another, to any person or entity not a party to this Agreement excepting the Parties' legal representatives. The Parties shall maintain in strict confidence any and all information disclosed. The Parties agree that if asked about directly, the Parties may state that they entered into a confidential agreement for litigation support.

6. Termination

a. Claimant shall only be entitled to terminate this agreement for good cause. The Parties agree that improved prospects of success in relation to the Claims or a change in Claimant's financial standing are not good causes. Death of Claimant shall not result in a termination of this agreement. All rights and obligations under this agreement shall pass to the Claimant's personal representatives.

b. Following termination of this agreement by Claimant, Company, at its own risk and for its sole benefit may continue the proceedings without the participation of Claimant. Company shall be entitled to require Claimant to continue proceedings if Company does not wish to continue proceedings in its own name and if Company does not wish to disclose the fact that the proceedings are being funded.

Litigation Funding Agreement

In this case, Company will indemnify Claimant for all legal costs associated with the proceedings and the Proceeds shall be paid in full to Company.

c. Company has taken on the legal costs risks known as of the date of this Agreement. In the event that new circumstances come to light or are brought to Company's attention for the first time, and as a result of such circumstances the prospect of success are lower than at the time of entering into this agreement, Company shall be entitled to terminate this agreement in whole or in part without notice and to cease any further funding of Claimant's Claims.

d. In any event, Company shall be entitled to terminate this Agreement in whole or in part at the conclusion of proceedings at each instance and to cease funding from that point onwards.

e. In the event of termination of this agreement by Company, Company shall pay the costs incurred to the date of termination and which apply to discontinue the Claims or part of the Claims immediately and most cost-effectively. The Claimant shall be entitled to continue with the proceedings to pursue the Claims at its own costs. In the event that the Claimant succeeds, the Claimant shall reimburse Company for all costs incurred by Company.

f. Company shall release or return any such securities as have been provided to Company once Company has no further interest in or reason to require a security.

7. **Settlement**

a. Claimant affirms that it has had full and lengthy opportunity to discuss with Company the options for and likelihood of settlement of Claims. Claimant believes that settlement of Claims gives the greatest chance that defendants will comply with the ADA.

b. Claimant therefore gives Company full and complete authorization to negotiate and accept any settlements of Claims. Claimant agrees to cooperate and consent to any settlement deemed reasonably by Company.

c. Claimant agrees to direct his/her attorney to settle Claims as directed by Company if so directed.

d. Claimant and Company jointly reaffirm their mutual goal to bring about ADA compliance through the filing of complaints asserting Claimant's Claims, and entering into settlement agreements with covenants to rectify ADA violations.

8. **Dispute Resolution**

a. In the event of disagreement arising during the negotiation, execution or performance of this agreement, the Parties shall first attempt to find an amicable solution by submitting a notice of dispute in writing.

b. If the Parties are unable to find an amicable solution within 30 days of a notice of dispute, the Parties agree to submit to a private and confidential mediation and shall mediate the matter no later than 120 days after the date of the notice of dispute.

c. If the Parties are unable to successfully mediate any dispute the parties agree to submit any claims or causes of action to private binding arbitration.

d. Each party shall bear their own costs at mediation and shall share the costs of the mediator.

e. If arbitration is necessary, the successful party shall be entitled to recover from the losing party its costs, fees, and expenses related to the arbitration.

Litigation Funding Agreement

## 9. **Miscellaneous**

   a. This agreement constitutes the entire Agreement between the parties and supersedes and terminates any previous agreements whether written or oral. Any modification or variation to this Agreement must be in writing.

   b. If any portion of this agreement is found to be void or unenforceable or a provision of the Agreement is missing, the remaining provisions of this Agreement shall continue in full force and effect.

   c. The Parties agree that this agreement shall be governed by Arizona law with venue of any dispute resolution proceeding to take place in the state and county in which Claimant resides at the time the Agreement was executed.

**The parties have executed this Agreement as of the date first written above.**

Name: _Alyssa Canton_

Name: _Alyssa Carton_____

**On behalf of Litigation Management**

**and Financial Services, LLC**

Litigation Funding Agreement

9. **Miscellaneous**
    a.  This agreement constitutes the entire Agreement between the parties and supersedes and terminates any previous agreements whether written or oral. Any modification or variation to this Agreement must be in writing.
    b.  If any portion of this agreement is found to be void or unenforceable or a provision of the Agreement is missing, the remaining provisions of this Agreement shall continue in full force and effect.
    c.  The Parties agree that this agreement shall be governed by Arizona law with venue of any dispute resolution proceeding to take place in the state and county in which Claimant resides at the time the Agreement was executed.

**The parties have executed this Agreement as of the date first written above.**

Name: _____

On behalf of Litigation Management
and Financial Services, LLC

Name: Alex Conian

, AUTHORIZED AGENT

Name: **Alyssa Carton**

## LITIGATION MANAGEMENT AGREEMENT

This Litigation Management Agreement ("Agreement") is entered into this ___ day of _____, 2016, by and between Sharon E. Pomeranz ("Attorney") and Litigation Management and Financial Services, LLC ("Company") (collectively referred to herein as "Parties") as follows:

## RECITALS

1. On July 26, 1990, the Americans with Disabilities Act ("ADA") was signed into law. The ADA is a comprehensive civil rights law prohibiting discrimination on the basis of disability.

2. The ADA contains four sub-parts. The first three sections of the statute, Titles I, II, and III, bar discrimination on the basis of disability in different areas of public life.

   a. ADA Title I addresses discrimination in employment and bars disability discrimination by an "employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. §§ 12111(2), 12112. Title I contains its own enforcement provision, § 12117, which incorporates the remedies of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e-4 to -9.

   b. ADA Title II, in pertinent part, bars disability discrimination in the services, programs, or activities of a "public entity," defined as a state or local government, its agencies or instrumentalities, and the National Railroad Passenger Corporation or any commuter authority. *Id.* §§ 12131(1), 12132. Title II contains an enforcement provision, § 12133, which incorporates the remedies of the Rehabilitation Act, 29 U.S.C. § 794a(a)(2), which, in turn, incorporates Title VI of the Civil Rights Act, 42 U.S.C. §§ 2000d, et seq.

   c. ADA Title III addresses disability discrimination in public accommodations, defined to include places of education including post-graduate private schools, and bars disability discrimination by "any person who owns, leases (or leases to), or operates a place of public accommodation." §§ 12181(7)(J), 12182. The enforcement provision of Title III, § 12188, incorporates the remedies of Title II of the Civil Rights Act, 42 U.S.C. § 2000a-3.

   d. The final sub-part of the ADA, Title IV, contains miscellaneous provisions. One of these provisions, § 12203, forbids retaliation against anyone for opposing actions made unlawful under the ADA or for participating in a charge under the ADA. § 12203(a). It also forbids coercion or intimidation against anyone exercising his or her rights under the statute. § 12203(b).

3. Title III of the ADA contains a list of general activities that it defines as discrimination: the denial of an opportunity to participate, 42 U.S.C. §§ 12182(b)(1)(A)(i), 12182(b)(1)(C); the provision of an unequal benefit, *id.* § 12182(b)(1)(A)(ii); and the provision of a separate benefit, unless doing so is necessary to provide a benefit that is as effective as that provided to others. *Id.* § 12182(b)(1)(A)(iii).[13] Furthermore, the statute requires benefits provided to people

**Exhibit 2**

with disabilities to be afforded in the most integrated setting appropriate to the needs of the individual. *Id.* § 12182(b)(1)(B).

4. Title III of the ADA prohibits discrimination on the basis of disability by those who own or operate places of public accommodation. 42 U.S.C. § 12182(a). In enacting the ADA, Congress found that "historically, society has tended to isolate and segregate individuals with disabilities." 42 U.S.C. § 12101(a)(2). The ADA's legislative history states that "[i]ntegration is fundamental to the purposes of the ADA. Provision of segregated accommodations and services relegate persons with disabilities to second-class citizen status." H. Rep. 101–485(III), 101st Cong., 2d Sess., at 56, *reprinted in* 1990 U.S.C.C.A.N. 445, 479. " '[T]he goal [is to] eradicat[e] the "invisibility of the handicapped." ' Separate-but-equal services do not accomplish this central goal and should be rejected." *Id.* at 50, 1990 U.S.C.C.A.N. at 473. The ADA provides a "broad mandate" to "eliminate discrimination against disabled individuals, and to integrate them 'into the economic and social mainstream of American life.' " *PGA Tour, Inc. v. Martin,* 532 U.S. 661, 675, 121 S.Ct. 1879,149 L.Ed.2d 904 (2001) (quoting H.R.Rep. No. 101–485, pt. 2, p. 50 (1990),*reprinted in* 1990 U.S.C.C.A.N. 303, 332).

5. This integration mandate is found in two sections of the statute. Title III makes it discriminatory to provide individuals with disabilities "with a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals, unless such action is necessary" to provide facilities, accommodations and the like that are as effective as those provided others. 42 U.S.C. § 12182(b)(1)(A)(iii). It also requires that "[g]oods, services, facilities, privileges, advantages, and accommodations shall be afforded to an individual with a disability in the most integrated setting appropriate to the needs of the individual." *Id.,* § 12182(b)(1)(B).

6. Section 303 of the ADA required that all facilities designed and constructed after January 26, 1993 must be "readily accessible to and useable by" individuals with disabilities. 42 U.S.C. § 12183(a)(1). The statute further instructed the DOJ to adopt implementing standards and regulations. 42 U.S.C. § 12186(b). On July 26, 1991, the DOJ adopted the Americans with Disabilities Act Accessibility Guidelines as the 1991 Standards. 28 C.F.R. § 36.406(a) (1991). The 1991 Standards are now published as Appendix D to title 28, part 36 of the Code of Federal Regulations. On September 15, 2010, the DOJ amended its regulations and adopted the 2010 Standards.

7. The ADA also provides a private right of action for preventative relief, including an application for a permanent or temporary injunction or restraining order for 'any person who is being subjected to discrimination on the basis of disability in violation of' Title III." 42 USC §§ 12182(a)(1), 2000a-3(a)).

8. Virtually all individual States have passed legislation similar in intent and scope to the ADA.

9. Private enforcement suits are the primary method of obtaining relief under the ADA.

10. Private enforcement suits are often brought by committed and passionate individuals desiring to ensure compliance with the ADA.

11. Company has been contacted by one or more individuals with disabilities ("Testers"), for the purpose of privately enforcing the ADA.

12. Testers desire to bring private civil rights enforcement lawsuits against places of public accommodations that discriminate against Testers and other individuals with disabilities.

13. Attorney is authorized to practice law in United States District Court for the District of _____.

14. Attorney desires to act as Testers' attorney in ADA civil rights enforcement actions.

15. Company is a litigation management company with ability to manage ADA litigation matters from the due diligence, pre-filing investigations, drafting, conducting discovery, and all phases of civil litigation.

**NOW, THEREFORE,** the Parties enter the following

**AGREEMENT**

1. **Limitation of Engagement:** This Agreement is limited to providing management services to Attorney only in ADA Actions filed by Attorney on behalf of Testers.

2. **Attorney – Company Relationship.**

   a. <u>Generally:</u> Attorney is retaining Company to provide all litigation support services within the broadest scope of ethical rules governing the practice of law. The litigation support includes Company providing receptionist, telephone, e-mail, paralegal and consulting services by Company attorneys knowledgeable and experienced in ADA enforcement actions.

   b. <u>Attorney Direction and Supervision of Company:</u> Attorney directs Company to provide services described in this Agreement.

   c. <u>Company's Management Assets Assigned to Attorney:</u> Company shall assign paralegals, staff and personnel to work for Attorney. Company shall purchase and maintain a new telephone number and e-mail address for Attorney in order to communicate and settle ADA actions with Defendant or Defendant's attorney. As required by local rules, Attorney's name, address, new telephone number and new e-mail address shall appear in every filing with the Court. Attorney's new telephone number and new e-mail address shall be implemented in each case through the Company's selection of an appropriate number and e-mail address. Attorney herein agrees to the implementation of a new number and email address on his behalf for the cases filed for Tester.

d.  Logistics: Upon the filing of a new complaint and the completion of service of process, Defendant or Defendant's Attorney is expected to contact Attorney. The contact will be made through Attorney's assigned paralegal or other staff who will answer the new phone line and the new address and commence negotiations. The paralegal shall maintain a log of all communications with opposing parties which log shall be maintained in a file accessible to Attorney and Tester through a secure file sharing and storage location. Likewise, the paralegal assigned to Attorney shall maintain all e-mail communications in a communications file available to Attorney and Client through a secure file sharing and storage location

e.  Communications: It is expected that all communications with opposing parties shall occur through phone calls and e-mails. All telephone and email communications shall be documented, saved, and shared through a log referenced above. In such cases when a defendant party contact's attorney directly, attorney shall immediately advise the assigned paralegal and give instructions whether Attorney will take over the negotiations or whether Attorney wishes paralegal to do so. In the event Attorney takes over communications, attorney shall be responsible for notating the communications logs in a secure file sharing and storage location.

3.  **Company's Duties and Obligations:** The Company, under the supervision, authority and consent of Attorney, shall manage all aspects of ADA civil actions. The Company shall:

a.  Design, pay for and maintain Pre-Filing Due Diligence Software ("DD Software") for the use of the Tester and Tester's assistant; and

b.  Develop, pay for and maintain Case Management Software specifically designed for ADA Actions; and

c.  Design, pay for and maintain a secure file sharing and storage location, such as dropbox, accessible to the Company, Attorney and Tester; and

d.  Hire, retain, and/or train employees with expertise in ADA litigation including, but not limited to, paralegals, secretaries, inspectors, and attorneys licensed to practice in a Federal District Court.

e.  Aid Tester and Tester's assistant to investigate and document ADA violations in public accommodations with the use of DD Software; and

f.  Based on DD software and ownership / control investigation, prepare a Due Diligence Report ("DDR") and file same in the dropbox; and

g.  Contact Tester directly for the purpose of preparing and submitting Motion to Proceed in Forma Pauperis pursuant to 28 U.S.C. § 1915 and to complete the Affidavit; and

Litigation Management Agreement

h.  On the basis of the DDR, prepare a (1) draft Verified Complaint which shall generally describe the ADA violations and append as Exhibit A the DDR for specific violations, (2) draft Motion to Proceed in Forma Pauperis, (3) draft Summons(es), (4) draft Civil Action Coversheet(s), and (5) other standard documents required to be filed in the Jurisdiction (cumulatively "Initial Court Documents") and save the same in the Dropbox; and

i.  Conduct a review of Initial Court Documents by Company; and

j.  Invite Attorney and Tester to review and approve / disapprove the draft documents for filing; and

k.  Upon Attorney's approval of the Initial Court Documents, file the same with the US District Court; and

l.  Pay the filing fee unless waived; and

m.  Serve Defendants and pay for service of process; and

n.  Conduct settlement discussions and:

    i.  Settle Cases, or

    ii.  Litigate cases under the direction of Attorney including drafting and filing a motion for preliminary injunction, motion for default judgment, motions for judgment on the pleadings, motion for summary judgment, and responses to Defendant(s)' motions.

o.  Prepare closing documents for approval by Attorney.


4. **Attorney's Duties and Obligations:** Attorney shall

a.  Contact the US District Court in which ADA enforcement actions are to be filed, and ensure that the Clerk's PACER distribution e-mails contain both Attorney's primary e-mail and paralegal's secondary e-mail.

b.  Review, approve (or disapprove) Initial Court Documents and any subsequent work papers; and

c.  Authorize Company in writing to file Initial Court Documents over Attorney's electronic signature; and

d.  Regularly review all Actions in the secure file sharing and storage location; and

e.  In those cases where Attorney handles negotiations and litigation, if any, maintain the current status of the case in a secure file sharing and storage location for review by Company and Tester; and

f.  Receive settlement amounts, if any, and distribute same as indicated below.

5.  **The Attorney – Tester Relationship:** The Attorney-Tester Relationship shall be governed by a separate Attorney-Client Agreement. The Attorney's agreement with Testers shall provide, *inter alia*, the following:

a.  That Testers are aware that in a federal ADA action, a plaintiff is not entitled to damages or recompense other than for costs, expenses and attorney's fees.

b.  That Testers are aware of the Attorney – Company Agreement (this Agreement) and consents to litigation services provided by Company for Attorney.

6.  **Compensation:** No compensation shall be due to Company until and unless an Action results in an actual judicial award or settlement payment ("Monetary Recovery") and the Monetary Recovery has cleared Attorney's Trust Account. Where the award has cleared Attorney's Trust Account, the following shall apply:

7.  <u>Acknowledgement of Fee Receipt</u>: a)  "Attorney acknowledges that they will be paid <u>One Hundred Dollars ($100.00)</u> per case filed, no matter the outcome of the cases filed." Attorney acknowledges that they have agreed, or will agree, in a separate agreement to receive from Tester(s) an amount of Attorney's fees in a negotiated attorney-client agreement with Testers. Attorney acknowledges that Testers pay the Attorney, via the Company, within twenty-one (21) calendar days of filing a Complaint. Attorney and Company recognize that the reasonable fees for Attorney's work on each case may be greater than or less than the actual amount received from Tester and the rates Attorney agrees upon are done so for purposes of serving the underserved and advancing ADA enforcement and compliance.

a.  <u>Management Payment Fee</u>: The Parties acknowledge and agree that a fair market rate for Company's services would exceed $10,000.00 per case filed. Despite the fair market rate, Company agrees to take a lower fee for purposes of serving the underserved and advancing ADA enforcement and compliance. Attorney agrees to convey to Company the full amount of any Monetary Recovery obtained through settlement. Attorney also agrees to convey to Company $2,000.00 for any case in which a Monetary Recovery is obtained through judicial order or other administrative order awarding costs, attorneys' fees, or other damages. Attorney's obligation to pay Company following an order does not arise until at least $2,000 is recovered in actual liquid funds.

8.  **Avoiding Unauthorized Practice of Law**
   a.  <u>General Guidelines</u>: A lawyer may use nonlawyers outside the firm to assist the lawyer in rendering legal services to the client. The ABA's Model Rule 5.3 and

accompanying comments shall serve as instruction and models for the conduct between Attorney and Company.

b. No Practice of Law by Company: Company affirms its commitment to avoid any unauthorized practice of law. Company will maintain the professional independence of Attorney. Company will make reasonable efforts to ensure that the Company's conduct is compatible with the professional obligations of Attorney.

c. Guidance by Attorney: Attorney will make reasonable efforts to ensure that the services provided by Company are done so in a manner that is compatible with the lawyer's professional obligations. Attorney will communicate directions appropriate under the circumstances to give reasonable assurance that the Company's conduct is compatible with the professional obligations of the lawyer.

   i. Local Standard: Attorney avers that he/she will review all local ethical rules in order to direct conduct of Company.

9. **Mutual Confidentiality and Non-Disclosure**

a. During the Course of Attorney and Company's relationship, the Parties may be exposed to or come into possession of information that is confidential and proprietary to the other party. For purposed of this section, the party receiving Protected Information (as hereinafter defined) is referred to as the "Recipient" and the party disclosing Protected Information is referred to as the "Disclosing Party." Each such party shall be responsible and liable for its respective representatives the same as if such representatives were co-parties to this section.

b. "Protected Information" means all information of either party (or information of a third party which either party has in its possession) including, but not limited to, information relating to business, trade secrets, financial information, marketing information, intellectual property rights, customer lists, operations and software products, computer source code and object code, hardware and software designs and specifications, reports, flow charts, technology, tax returns, client lists, pricing, business plans and related documents, and any such other information that either party would reasonably consider to be confidential or proprietary. Unless excluded in writing by Disclosing Party, both Parties shall assume that any and all information disclosed in Protected Information, whether in oral form, metadata, written, or in some other tangible or intangible form, and whether designated as confidential or unmarked.

c. If disclosure of the Protected Information is required by any court order or similar order to which Recipient must comply, Recipient shall immediately notify Disclosing Party to allow Disclosing Party to object to the disclosure and to take additional confidentiality precautions. Recipient shall take precautions to protect the confidentiality of the Protected Information to be disclosed. Recipient will make formal or legal objections on its own behalf and on behalf of Disclosing party if so requested by Disclosing Party.

d. Recipient shall not use or disclose Protected Information of Disclosing Party except in further of the relationship between the Parties hereto. The Parties agree to disclose Protected Information to their representatives only on a need-to-know basis, and only after such representatives have been informed of the terms of this Agreement and been given an opportunity to review it. All Protected Information

shall remain the sole property of Disclosing Party. Upon termination of this Agreement or upon request by Disclosing Party, Recipient shall promptly return to Disclosing Party, or destroy at Disclosing Party's request, all materials in Recipient's possession or control that contain any Protected Information. Any copies of such items or material shall also be returned or destroyed. Nothing contained in this Agreement shall be construed as granting or conferring any right, title, or interest, in any Protected Information, patent, trademark, copyright, trade secret or other proprietary right that is now or subsequently owned by Disclosing Party. Recipient shall not reverse engineer, decompile or disassemble any software disclosed by Disclosing Party. Recipient shall not alter, modify or prepare derivative works from the Protected Information except in connection with the business relationship among the parties, and all such derivative works shall be destroyed at the request of Disclosing Party.

    e.   Recipient shall not utilize any knowledge gained or access to Disclosing Party's Proprietary Information to develop products or solutions that are competitive to those of Disclosing Party; provided however, that nothing in this Section shall preclude Recipient from independently developing products or solutions if such Recipient can demonstrate by competent evidence that such product or solution was independently developed through no use of Protected Information provided by Disclosing Party.

    f.   Neither party has made or is making any representation or warranty regarding the accuracy or completeness of the Protected Information.

**10. Damages**

    a.   The parties acknowledge and agree that violation of this Agreement may cause irreparable harm, which may not be fully or adequately compensated by recovery of monetary damages. Accordingly, in the event of any violation or threatened violation of the terms of this Agreement, the breaching party shall be entitled to injunctive relief from a court of competent jurisdiction in addition to damages and any other remedy available at law or in equity. If any action at law or in equity is brought to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to recover, at trial and on appeal, reasonable attorneys' fees, costs and disbursements in addition to any other relief that may be granted.

**11. Term and Termination**

    a.   <u>Term</u>: This Agreement shall become effective on the date first written above and, unless superseded by a subsequent agreement, shall remain in effect for so long as Company refers Testers to Attorney.

    b.   <u>Termination of Relationship</u>: Any party to this Agreement may terminate the relationship established by this agreement upon delivery of a written 20-day notice of intent not to continue the Parties' relationship.

    c.   <u>Remaining Obligations</u>: In the event a party terminates the Parties' relationship, all duties and obligations under this Agreement will remain in effect for cases filed including Company's obligation to provide litigation support, Attorney's obligation to represent Testers, and Attorney's obligation to pay Company all funds received from judgment or settlement.

    d.   <u>Opportunity to substitute</u>: If a party elects to terminate the Parties' relationship, a party may elect to use a substitute or alternative to provide the services described

within this Agreement. Despite the opportunity to substitute services, the obligations for monetary payment to Company will remain in effect for all cases filed.

e. <u>Non-Delegable Duty to Pay</u>: Company acknowledges the attorney-client relationship between Attorney and Testers. The parties affirmatively agree that the obligation to pay settlement proceeds from Testers' cases is the sole obligation of Attorney and such duty is non-delegable.

**The parties have executed this Agreement as of the date first written above.**

**By:**_____    **By:**_____

**Name:** Alex Callan_____    **Name:** Sharon E. Pomeranz_____

**Agent of Litigation Management and**

**Financial Services, LLC**

within this Agreement. Despite the opportunity to substitute services, the obligations for monetary payment to Company will remain in effect for all cases filed.

e.  Non-Delegable Duty to Pay: Company acknowledges the attorney-client relationship between Attorney and Testers. The parties affirmatively agree that the obligation to pay settlement proceeds from Testers' cases is the sole obligation of Attorney and such duty is non-delegable.

The parties have executed this Agreement as of the date first written above.

By: _____                By: _Sharon E. Pomeranz_

Name: _Alex Callan_                         Name: _Sharon E. Pomeranz_

Agent of Litigation Management and

Financial Services, LLC

SHARON E. POMERANZ
Attorney at Law
15A Cibola Circle
Santa Fe, NM 87505
sharonesantafe@gmail.com
(505) 469-5051

May 12, 2017


Chambers of the Honorable Judge Molzen
U.S. District Court
333 Lomas Blvd.
Albuquerque, New Mexico

VIA EMAIL:  molzenchambers@nmcourt.fed.us

Dear Judge Molzen:

Please find attached the Agreements entered into between Alyssa Carton and Litigation
Management and Financial Services (LMFS), and myself and LMFS, as ordered by the Court.

As part of the court's consideration of sanctions, I submit that I did not violate my ethical duties
to the client, my intentions were to represent my client's civil rights.  There is no statutory
requirement that lawyers write letters to businesses who are alleged to be in violation of the
American with Disabilities Act (ADA), although there may be a preference for such professional
courtesy or conduct.  No injury was caused by my conduct, in fact, at least a dozen businesses
willingly remediated their ADA violations.  The client was informed and consented to being a
Plaintiff in these matters, as she told the court, she wanted to be an advocate for herself, and
people like her who are in wheelchairs.  Alyssa Carton was not a pawn, and participated fully
with the goal of achieving widespread compliance with the ADA.  Alyssa, unfortunately, did not
reveal to me that she did not experience each barrier she alleged in the Complaints.

I apologize for not being more savvy in the ways of litigation funding, and for not seeing the
flaws in the litigation model I agreed to advance.  I have worked primarily for legal aid,
nonprofit, and public defender organizations for the past twenty years.  I have not been
disciplined prior by any Court, nor the State Board of Bar examiners in my long career.  This is
my first such incident of unprofessionalism to any degree.  I understand if the court chooses to
admonish or reprimand me for my representation of Alyssa Carton.


Sincerely,


Sharon Pomeranz, Esq.

**Exhibit 3**

**On May 12, 2017, at 5:06 PM, Craig Broadbent <craig@litmanco.com> wrote:**

Sharon,

I am first confused why any individual representative or employee of our company was a point of discussion at all. Secondly, I am further confused by the comment on sanctions. Alex was never a named party in any Arizona case. Alex was never sanctioned. Alex's personal conduct has never been an issue for any court in Arizona. ADA litigation of the type Alyssa pursued was never instituted by our company in Arizona. I am aware and continue to follow the AID, LLC cases, but those organization initiated suits are dramatically different than personal suits. While those AID cases have been dismissed, there is no punitive award issued; neither fees nor sanctions. I am unaware of any Arizona state court or federal court for the district of Arizona ruling that any ADA suit was malicious.

I am therefore baffled if any member of the NM bar would utter such a statement on the record because such a claim would be demonstrably false for multiple reasons and apparently discussed non-parties who were not invited to defend themselves or conduct cross-examination. I trust that you corrected the record and appreciate any efforts you took to narrow the scope in what sounds like a hearing that dramatically veered away from the initial scope of inquiry. I will advise after review of your full update.

Thank you,

Craig Broadbent

**Exhibit 4**